IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

DARREN JORDAN                                                                                    PLAINTIFF

VS.                                                                       CIVIL ACTION NO. 1:19-CV-160-GHD-DAS

GREATER COLUMBUS LEARNING CENTER;
LOWNDES COUNTY SCHOOL DISTRICT;
DAVID DUNN AND LYNN WRIGHT,
individually and in their official capacities; and
JOHN DOES 1-5                                                                                  DEFENDANTS

**OPINION GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTIONS TO STRIKE PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Presently before the court are (1) the Defendants' separate Motions for Summary Judgment [49; 52] and (2) the Defendants' separate Motions to Strike Plaintiff's Combined Response in Opposition to the Defendants' Motions for Summary Judgment [70; 73]. Upon due consideration and for the reasons stated herein, the Court finds the Motions for Summary Judgment [49; 52] are well-taken and should be GRANTED, while the Motions to Strike [70; 73] should be DENIED.

### I. Procedural Posture

On September 6, 2019, the Plaintiff filed in state court his Complaint alleging employment discrimination in violation of Title VI of the Civil Rights Act of 1964 ("Title VII") and the Equal Pay Act of 1963, hostile work environment, retaliation, defamation, negligent and intentional infliction of emotional distress, breach of contract, negligence, gross negligence, and mental anguish and suffering, all arising from his employment as the Executive Director of the Greater Columbus Learning Center—one of the Defendants in this case—and his subsequent termination from that organization [2, at 1]. The case was removed to this Court, in light of the federal subject matter lying at the heart of the Complaint [3]. Following discovery, Defendants Greater Columbus

Learning Center ("GCLC") and David Dunn filed a Motion for Summary Judgment [49] and supporting memorandum [50]. Defendants Lowndes County School District ("LCDS") and Lynn Wright followed suit, filing their own Motion for Summary Judgement [52] and supporting memorandum [54]. In response, the Plaintiff filed a Combined Response in Opposition to the Defendants' Motions for Summary Judgment [59] and supporting brief [58]. The Defendants filed separate replies to the Plaintiff's Combined Response [76; 77], and thus the Defendants' separate Motions for Summary Judgment [49; 52] are now ready for review. The same is true for the Defendants' separate Motions to Strike the Plaintiff's Combined Response [70; 73].

## II. Factual Background and Relevant Allegations

The Plaintiff, a black man, worked for Defendant GCLC for the 26 years prior to the events of this lawsuit [58, at 1-2]. From 1993 to 2010, he worked as an instructor, and in 2010 he became Defendant GCLC's Executive Director, taking over the position from Ms. Ellie Graham, a white woman [*Id.*, at 2]. Defendant GCLC was originally located on the campus of the Mississippi University for Women (MUW), and later transitioned to an off-site location [*Id.*]. At some point during that process, Defendant GCLC cut its ties with MUW and connected with Defendant LCSD [*Id.*]. The Plaintiff was originally hired by MUW on November 4, 1993, and then hired by Defendant LCSD on June 28, 2000 [*Id.*]. The Plaintiff was successful in his new position for several years [*Id.*, at 3–4]. However, this changed in 2017, when Defendant Lynn Wright, a white man and the Superintendent of Education for Defendant LCSD [2, at 2], proposed that Defendant GCLC merge with the East Mississippi Community College ("EMCC") [58, at 4]. The Plaintiff opposed this proposal, and instead advocated before Defendant GCLC's Board of Trustees that Defendant GCLC should remain an independent entity [*Id.*, at 5]. The

2

Plaintiff alleges that, at around this time, he began to suffer mistreatment at the hands of the members of the board, specifically from Defendant David Dunn, a white man and the President of Defendant GCLC's Board of Trustees [*Id.*; 2, at 2]. The Plaintiff claims that this alleged mistreatment was the result of his opposition to the proposed merger with EMCC [58, at 5]. The Plaintiff alleges that he "voiced to the board his grief over the years of being left to run the facility with no support from the board members, for their unwillingness to support the mission of the organization, for never assisting in securing funds and for generally being derelict in their duties as board members" [*Id.*]. The Plaintiff alleges that, in response to these concerns, Defendant Dunn told the Plaintiff "in no uncertain terms" that the Plaintiff was "'in no position to dictate' on those matters" [*Id.*]. The Plaintiff alleges that this statement, "when coupled with the venom exhibited and expressed" to the Plaintiff was "a clear dog whistle language that espoused a hierarchy held by a white supremacist ideology" [*Id.*]. The Plaintiff alleges that the Board, at the urging of Defendant Dunn, began to scrutinize and attack the Plaintiff over his handling of Defendant GCLC's operations [*Id.*]. The Plaintiff alleges that Defendant Dunn berated him in front of others, including the Plaintiff's wife and his subordinates, and this alleged hostile treatment continued and intensified until the Plaintiff's termination in early 2019 [*Id.*].

During or around January 2018, Ms. Sandy Crist of the Mississippi Community College Board ("MCCB") visited and inspected Defendant GCLC [*Id.*, at 6]. On April 20, 2018, Ms. Crist sent a letter to the Plaintiff detailing the results of her visit to Defendant GCLC's facility [49-2]. Ms. Crist expressed serious concerns about the decline of enrollment, the lack of student attendance, the high cost per student, test administrator certification, and lack of student records [*Id.*]. She also recommended immediate training on test administration and student record-

3

keeping [*Id.*]. She also presented issues related to payroll and time-keeping records [*Id.*]. Another issue pertained to software used in the classroom [*Id.*]. Additionally, Ms. Crist wrote that the Plaintiff made an untruthful statement regarding bank accounts used by the center; the Plaintiff indicated that the center's BancorpSouth account was its only bank account, but the center also actually had a bank account with Cadence Bank [*Id.*]. The Plaintiff has denied making this untruthful statement [61-1, at 9–10]. Ms. Crist stated that a written response to her letter and a Corrective Action Plan was required from the center [49-2].

The Plaintiff prepared a plan, and presented it to the Board [58, at 6]. Nevertheless, the MCCB sent a letter to the Plaintiff on June 22, 2018, in which it stated that it would not approve a continuation grant award to GCLC because it had failed to comply with grant requirements and regulations, specifically the Adult Education Program Guidelines and test publisher guidelines [49-3]. These shortcomings included failures to monitor testing areas, failures to make personnel available for testing at scheduled times, and "behavior that does not support the vision and mission of the Office of Adult Education" [*Id.*]. The MCCB also suspended the center's ability to provide high school equivalency testing [*Id.*]. Similarly, on June 27, 2018, United Way of Lowndes County suspended all of its funding to the center [49-4].

To account for the loss of funds from the MCCB pulling its funding to Defendant GCLC, the Plaintiff created a plan for continued operations that included an amended budget and a voluntary pay cut for the Plaintiff [58, at 6]. The Board approved the plan and the new budget [*Id.*]. On August 21, 2018, Defendant GCLC engaged the services of the accounting firm T.E. Lott & Company ("Lott") [49-5]. Lott produced a report about the center, and submitted it to Defendant GCLC on November 26, 2018 [*Id.*]. In its report, Lott noted that the center's

4

BancorpSouth bank account activity and balance had not been included in the center's accounting records [*Id.*, at 3]. This account had over $75,000 in it [*Id.*, at 6]. Similarly, Lott noted issues related to employee time sheets and lack of proof of management approval on purchases made by the center [*Id.*, at 4]. Lott also noted discrepancies between bank statements and records made in the center's QuickBooks ledger [*Id.*, at 6]. Lott's investigation also uncovered payments of over $4,000 to someone named "Cynthia Cunningham" [49-6]. The Plaintiff's wife's name is Cynthia and her maiden name is Cunningham, though she has indicated that she has a cousin with the same name as well [49-7, at 10–12]. The Plaintiff's wife has said during a deposition that she has never worked at the center [49-7, at 96].

On February 12, 2019, Defendant GCLC's Board of Directors held a meeting during which they discussed the job performance of the Plaintiff [49-9]. At that meeting, Defendant Dunn advocated for terminating the Plaintiff [*Id.*]. At the meeting, the Board gave the following reasons for terminating the Plaintiff:

1. The Plaintiff had failed to properly manage the center, as evidenced by the MCCB audit conducted by Ms. Crist;

2. Because of the Plaintiff's failures to properly manage the center, Defendant GCLC lost approximately $250,000 in state grant funds; lost funding from United Way of Lowndes County and the Lowndes County Board of Supervisors; lost accreditation with MCCB; and lost the ability to give high school equivalency tests;

3. The Plaintiff maintained sloppy financial records for purchases and reimbursements, to the point that the center lacked a clear record explaining his expenditures of certain GCLC funds;

5

4. The Plaintiff failed to provide the Board, and its accountants with Lott, with accurate financial information by failing to disclose the existence of the center's BancorpSouth checking account, which resulted in inaccurate financial reports being sent to the Board, the United Way of Lowndes County, the State of Mississippi, and the IRS;

5. There was a "complete breakdown in the relationship between [the Plaintiff] and this Board because [the Plaintiff] misled the Board on more than one occasion about critical information. When the Board attempted to correct him and restore the relationship [the Plaintiff] did not receive this correction. This Board no longer trusts [the Plaintiff]";

6. The Plaintiff failed to provide "sufficient corrective, disciplinary action and control over GCLC employee Administrative Assistant Alicia Prude. On more than one occasion, Ms. Prude interacted with staff and students in an unprofessional manner. In two of those incidents with one student, verbal altercations between Prude and this student in the GCLC lobby ended up in 'shouting matches,' one of which was captured on video and played for the Board at this meeting. This video was played at the Board meeting. One of these altercations between Prude and a student was witnessed by President Dunn and Board Member Wright during the summer of 2018. GCLC students, former students, former GCLC employee Krystle Osburn and GCLC employees made similar claims against Ms. Prude and [the Plaintiff] saying that they acted unprofessionally towards them. Some of this information was reduced to writing, provided to the GCLC Board and [the Plaintiff]";

7. Osburn's claims that she was verbally abused by Prude and the Plaintiff;

6

8. Osburn's claims that students whom she identified as possibly having special needs were not referred out for further testing to determine if they were entitled for special testing accommodations, and that she was fired because she insisted that one particular student needed these accommodations; and

9. The Plaintiff "failed in numerous other ways, all of which constitutes other good cause for employment termination" [49-9].

Ms. Osburn and a GCLC student spoke at the Board meeting [*Id.*]. After they departed, the Plaintiff responded to their accusations by saying that he fired Ms. Osburn because the Lowndes County Youth Court Administrator, Mr. Jason Collins, told him both that Ms. Osborn acted in an unprofessional manner at the county's Detention Center and that she could no longer work there [*Id.*]. At the meeting, the Plaintiff called Mr. Collins, and placed the call on speakerphone [*Id.*]. Mr. Collins told the Board about an incident at the Detention Center at which Ms. Osborn and another employee got into an argument, and Mr. Collins characterized Ms. Osburn's reaction as not appropriate [*Id.*]. Defendant Dunn asked Mr. Collins if Ms. Osburn continued to work at the Detention Center after this incident, and Mr. Collins told the Board that she did [*Id.*]. In response to another question from Defendant Dunn, Mr. Collins told the Board that Ms. Osburn had not repeated this behavior [*Id.*]. In light of this, the Board viewed the Plaintiff's statement about his reason for firing Ms. Osburn, i.e. that Mr. Collins would not allow her to work at the Lowndes County Detention Center, as misleading and included it on its list of reasons for firing the Plaintiff [*Id.*]. At the meeting, the Board voted to fire the Plaintiff, and to recommend to Defendant LCSD that the Plaintiff be terminated [*Id.*]. On February 18, the Board of Directors of Defendant LCSD voted to terminate the Plaintiff [52-5].

7

On February 12, 2019, Defendant Wright sent the Plaintiff a Notice of Termination from Defendant LCSD [67-1, at 11]. Defendant Wright gave the following reasons for terminating the Plaintiff:

1. "Poor financial record-keeping";

2. "Inadequate records of credit card purchases"

3. "United Way, general ledger, 990 financial reports inaccurate";

4. "Unprofessional conduct of employee";

5. "Violations of Miss. Dept. of Ed. Code of Ethics: Standard 1: Professional Conduct 1. If professional relationship with parents, 1.2 b. Misuse or mismanagement of test/test material, 1.2e. Failure to provide appropriate supervision and discipline. Standard 2: Trustworthiness 2.1a. Properly presenting facts in an educational matter. 2.2a. Falsifying, misreporting, omitting, or erroneously reporting information. Standard 7: Public Funds and Property 7.2b. Failing to account for funds collected from students, parents. 7.2c. Co-mingling of school-related funds with personal funds or checking accounts" [*Id.*].

On March 5, 2019, the Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission against Defendant LCSD, alleging discrimination against him because on his race and sex ("EEOC") [67-1, at 12]. In his Charge of Discrimination, the Plaintiff alleges that he was terminated "after terminating a female Caucasian employee for insubordination and unprofessional behavior" [*Id.*]. He also notes in his Charge of Discrimination that the Board hired a Caucasian female to replace him and rehired the Caucasian female that he terminated, namely Ms. Graham and Ms. Osburn, respectively [*Id.*]. The Plaintiff

8

also filed an EEOC charge of discrimination against Defendant GCLC, but that charge was closed without any further action after the EEOC determined that Defendant GCLC employed less than the statutorily required number of employees [49-10, at 1–3].

In his Combined Response to the Defendants' Motions for Summary Judgement, the Plaintiff alleges that, during and following the events in 2018, Defendant Dunn continued his attacks against the Plaintiff, undermined Plaintiff's work, and scapegoated the Plaintiff in his calls for closing Defendant GCLC [58, at 6]. The Plaintiff alleges that Defendant Dunn unilaterally moved the Board's meetings to Defendant Dunn's private law office so that he could bully and intimidate the Plaintiff [*Id.*]. The Plaintiff alleges that Defendant Dunn refused to allow the Plaintiff to lead the Board's meetings, as the Plaintiff's predecessor had done; locked the Plaintiff out of meetings; and called surprise Board meetings at which the Plaintiff's subordinates made accusations against him [*Id.*]. The Plaintiff alleges that he was given no notice of these meetings nor the opportunity to defend himself against these accusations [*Id.*]. The Plaintiff further alleges that Defendant Dunn yelled at him, berated him constantly, slammed his fist on the table at the Plaintiff, and "physically stood over [the] Plaintiff during meetings in an intimidating manner while he yelled at [the] Plaintiff" [*Id.*, at 7]. He similarly alleges that Defendant Dunn threatened Plaintiff against contacting any other members of the Board [*Id.*]. The Plaintiff alleges that he reported Defendant Dunn's alleged actions to Defendant Wright, and sought help from him [*Id.*].

The Plaintiff also alleges that Defendant Dunn provoked the Board into preventing the Plaintiff from accessing Defendant GCLC's financial accounts; this came in response to the Plaintiff's request for money allegedly owed to him [*Id.*]. In 2011, the Board voted to pay the

9

Plaintiff an additional $500.00 monthly stipend for his work as the GED Chief Examiner [*Id.*]. The Plaintiff has yet to receive this money [*Id.*], although he has access to the relevant GCLC account and could have taken this supplemental stipend himself at any time of his choosing. Additionally, the Plaintiff alleges that Defendant Dunn prompted the Board to overturn one of the Plaintiff's personnel decisions in which the Defendant suspended without pay Ms. Prude, a black GCLC worker, for 30 days for unprofessional conduct involving a student [*Id.*]. The Plaintiff alleges that Defendant Dunn recommended to the Board that the Plaintiff be terminated because Prude should have been fired, rather than suspended [*Id.*]. The Plaintiff alleges that, around the same time that Defendant Dunn was calling for the Plaintiff's termination for his actions regarding Prude, Defendant Dunn was calling for the reinstatement of Ms. Osburn, a white worker whom the Plaintiff fired for various acts of professional misconduct including "incidents involving embezzling work time, stealing property belonging to the center, soliciting existing partners of GCLC for personal gain to set up a competing GED service, showing up for work at the local jail with the smell of marijuana coming from her vehicle, causing a disturbance at a second off-site tutoring location, [and] calling [the] Plaintiff a 'nigger,' among other notable acts of insubordination" [*Id.*, at 8]. The Plaintiff indicates that the differences in the infractions committed by Prude and Osburn were the reason for the different punishments that the two workers received [*Id.*]. Nevertheless, the Board, allegedly at Defendant Dunn's insistence, overturned the Plaintiff's decisions; Prude was terminated while Osburn was rehired [*Id.*]. Osburn was fired again only days after being rehired, this time at the hands of Ms. Graham, who took over the Executive Director position after the Plaintiff was terminated [*Id.*]. The Plaintiff alleges that Defendant Dunn, motivated by racial animus, believed that a stiffer penalty was

10

more appropriate for the black worker, Prude, than the white worker, Osborn [*Id.*, at 8–9]. The Plaintiff further alleges that he was "given the clear message by the Defendants in this instance and over time that he could be as harsh as he liked for black workers, but not for a white worker" [*Id.*, at 9].

Similarly, he alleges that he was terminated "for refusing to make decisions along racial lines and for asserting himself as a black man in leadership against a white man who espoused white supremacist ideology" [*Id.*]. He notes that in his place as Executive Director, the Defendants hired a white woman who "ultimately ushered the center to the merger that Dunn and Wright wanted" [*Id.*].

### III. <u>Legal Standard</u>

Summary judgment is warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). This rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. The party moving for summary judgment bears the burden of identifying its basis for the motion, and must point to specific parts of the record that support its contention of an absence of a genuine dispute of material fact. *Id.* at 323.

After the moving party does so, the burden shifts to the non-moving party, which must "go beyond the pleadings and by … affidavits, or by the 'depositions, answers to interrogatories, and

11

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324; *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001); *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995). When there is a dispute about the facts, the Court must view the facts in the light most favorable to the non-moving party and likewise must draw reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "However, a nonmovant may not overcome the summary judgment standard with conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McClure v. Boles*, 490 F.App'x 666, 667 (5th Cir. 2012) (per curiam) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007)).

Any claim that is not raised in a response to a defendant's motion for summary judgment is deemed to be waived. *Aldrup v. Caldera*, 274 F.3d 282, 288 (5th Cir. 2001). Moreover, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (citing *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas*, 136 F.3d at 458. That said, summary judgment "must be used cautiously or it may lead to drastic and lethal results." *Murrell v. Bennett*, 615 F.2d 306, 309 (5th Cir. 1980). This is particularly true regarding cases of alleged employment discrimination. *See Thornbrough v. Columbus and Greenville Railroad Co.*, 760 F.2d 633, 640–41 (5th Cir. 1985).

### IV. Legal Analysis of the Issues at Play in This Case

#### A. Employment Discrimination

"The complainant in a Title VII trial must carry the initial burden under the statute of establishing a *prima facie* case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). After the plaintiff meets this initial burden, the burden shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for their action against the plaintiff. *Id.* However, "the inquiry does not end here." *Id.* at 804. The burden then shifts to the plaintiff, who must demonstrate that the defendant's statement reason was merely a pretext for discriminatory action. *Id.* In the absence of such a demonstration, the plaintiff's case must fail. *Id.* at 807. This same principle is true in cases of alleged failure to promote and wrongful termination based on discrimination. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–54. "The burden of establishing a *prima facie* case of disparate treatment is not onerous… the prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" *Id.* at 253–54 (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978)). After this stage, as indicated above, the burden shifts to the defendant, who must "rebut the presumption of discrimination by producing evidence" of a legitimate, non-discriminatory reason for their actions." *Id.* at 254. This is accomplished by raising a genuine

13

issue of material fact regarding the plaintiff's case of alleged discrimination, and the defendant need not persuade the court of its motives at this juncture. *Id.* at 255. If the defendant does so, the plaintiff's *prima facie* presumption is rebutted, "and the factual inquiry proceeds to a new level of specificity." *Id.* At this stage, the plaintiff must demonstrate that the defendant's offered reason was not "the true reason" for their employment decision; this burden merges with the plaintiff's "ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* at 256. Specifically, the plaintiff can succeed at this stage "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (citing *McDonnell Douglas*, 411 U.S., at 804–805).

In the case *sub judice*, the Plaintiff has successfully presented a *prima facie* case of discrimination. Taking the facts and inferences in his favor, he has shown that: he is a member of a protected class; he is qualified for his job; that he was fired, and that the job was filled by someone who was not a member of his protected class [2; 58, at 17]. Turning to the next stage, the Defendants have presented to the Court legitimate, non-discriminatory reasons for the Plaintiff's termination, namely their misgivings about the Plaintiff's management of personnel and finances. *See supra* Part II. Perhaps most prominently, the Defendants point to the Plaintiff's inability to prevent the loss of funding and accreditation from MCCB, United Way of Lowndes County, and Lowndes County Board of Supervisors, as well as financial and bookkeeping problems uncovered by Ms. Crist and Lott [49-2; 49-3; 49-4; 49-5; 49-6; 49-9]. This issues alone are worthy of consideration, and appear to be valid and justifiable grounds for termination. Thus, the burden shifts back to the Plaintiff, who needed to show why the

14

Defendant's reasons were pretextual or "unworthy of credence," or demonstrate that a discriminatory reason was more likely to have motivated the Defendants than the reasons that they have provided. *Burdine*, 450 U.S., at 256. The Court finds that this is where the Plaintiff has failed to meet his burden. In his brief supporting his Combined Response to the Defendants' Motions for Summary Judgment, the Plaintiff fails to even address the issue of pretext and the subject of the Defendants' proffered reasons [58, at 16]. Instead, he merely points to considerations made during the first step of the *McDonnell Douglas* process, and then rounds out his argument with conclusory statements [*Id.*]. To support his allegations of racial animus, the Plaintiff only presents citations to his own words in his depositions, as well as the words of his wife in her depositions [58]. This is simply not enough to establish anything beyond a scintilla of evidence, if that. Because the Plaintiff has failed to demonstrate that the Defendants' reasons were pretextual, the Defendants' Motions for Summary Judgment are GRANTED on this issue.

### B. Hostile Work Environment

The Plaintiff fails to present any evidence to support his allegations of a hostile work environment. Specifically, among other charges, he alleges that he was subject to threatening emails, but fails to produce these emails. Instead, the Plaintiff relies on conclusory statements and his own depositional testimony; this is patently insufficient to overcome summary judgment. For this reason, the Defendants' Motions for Summary Judgment is GRANTED on this issue.

### C. Retaliation

To establish a *prima facie* case of retaliation, "a plaintiff must show that (1) []he participated in a Title VII protected activity, (2) []he suffered an adverse employment action by [his] employer, and (3) there is a causal connection between the protected activity and the

15

adverse action." *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir.2009). As with adverse employment actions, "[a] Title VII retaliation case is also subject to the burden-shifting framework set forth in *McDonnell Douglas*." *Roberts v. Unitrin Specialty Lines Ins. Co.*, 405 Fed. Appx. 874, 879 (5th Cir. 2010) (citing *LeMaire v. Louisiana*, 480 F.3d 383, 388–89 (5th Cir. 2007)).

Here too, the Plaintiff fails. Even if the Court were to accept the Plaintiff's tenuous argument that his alleged complaints about a hostile work environment and statements made to his supervisors about being forced to treat employees differently based on race qualify as protected activity, the Plaintiff fails to cite to any evidence documenting these allegations. Furthermore, the Plaintiff fails to cite to any evidence establishing a causal connection between this alleged activity and the adverse action, i.e. his termination. Likewise, he fails to present any evidence demonstrating why the Defendants' stated reasons for this adverse action were pretextual. In short, the Plaintiff fails to present any evidence on this claim whatsoever. For these reasons, the Defendants' Motions for Summary Judgment are GRANTED on this issue.

### D. Equal Pay

Plaintiff claims that he is owed a supplemental stipend that was provided to his predecessor and that he did not receive [58, at 19]. Even under Plaintiff's alleged facts, he admits that both he and his predecessor were approved for the same stipend [*Id.*], and thus were offered equal pay. In his own depositional testimony, the Plaintiff concedes that he knew that he was entitled to this stipend, that he had access to the discretionary account from which it was to be taken, that it was at his own discretion to take this money, and that he elected not to take it in favor of "waiting for when [he] decided that [he] wanted to take it" [52-7, at 91–93]. When

asked about whether it was his decision to withhold payment from himself, the Plaintiff stated, "Well, it wasn't ever said that I wasn't paying myself. I was just leaving the money in the account, like a savings" [52-7, at 94, lns. 16–18]. Furthermore, in her deposition, the Plaintiff's wife also testified that the Plaintiff refused to accept the stipend "to help teachers keep their job and to help the program" [49-7, at 55, lns. 18–21]. In addition to conceding that the Plaintiff treated the GCLC account as if it were his own personal savings account, it seems apparent that Plaintiff's election throughout the course of his employment to withhold his own payment in a GCLC account to which he had access constitutes either a waiver of those funds, a straightforward refusal to accept payment or a failure to adequately accept payment of his own approved stipend due to the Plaintiff's financial failings, as Defendant GCLC contend in their Motion for Summary Judgment [50, at 8]. Additionally, the equitable defense of laches appears applicable in his case, as Defendant GCLC claims [Id., at 9]. In the face of these considerable arguments claiming defenses of waiver and laches, the Plaintiff presents nothing in his favor in his Combined Response to the Defendants' Motions for Summary Judgment. As the Plaintiff fails to rebut these defenses of waiver and laches, and the persuasive nature of the facts underpinning these defenses, these defenses must be accepted and any arguments against them must be considered waived. For these reasons, the Defendants' Motion for Summary Judgment must be GRANTED on this issue.

### E. Defamation, Negligent and Intentional Infliction of Emotional Distress, Breach of Contract, Negligence, Gross Negligence, and Mental Anguish and Suffering

The Plaintiff fails to present any evidence in support of these claims, and fails to address them in his Combined Response to the Defendants' Motions for Summary Judgment. As such,

they must be considered abandoned. For this reason, the Defendants' Motions for Summary Judgment must be GRANTED on these issues.

### V. Plaintiff's Violation of the Local Rules

The Court is of the opinion that by filing in an untimely manner a combined response to the two motions for summary judgment filed by different defendants, the plaintiff ignored the provisions of Local Rules 7(b)(3)(B) and 7(b)(4). This should not be repeated. The Plaintiff should be cognizant of the Court's Local Rules in the future. The Court further opines, however, that striking the combined response would be unduly harsh. In rendering the above opinion, the Court fully considered all of the averments and arguments contained in the combined response of the Plaintiff. Accordingly, the Defendants' Motions to Strike the Plaintiff's Combined Response in Opposition to the Defendants' Motions for Summary Judgment [70; 73] are DENIED.

### VI. Conclusion

In sum, for all of the reasons stated above, the Court finds that there is no genuine dispute of material fact in this case, and that summary judgment in favor of the Defendants is warranted. Thus, although the Defendants' Motions to Strike the Plaintiff's Combined Response in Opposition to the Defendants' Motions for Summary Judgment [70; 73] are DENIED, the Defendants' Motions for Summary Judgment [49; 52] are GRANTED.

An order in accordance with this opinion shall issue this day.

THIS, the 24th day of November, 2020.

_____
SENIOR U.S. DISTRICT JUDGE